UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

APRIL OVERMAN

CIVIL ACTION

VERSUS

NUMBER 13-614-SCR

CITY OF EAST BATON ROUGE, ET AL

## OPINION

Plaintiff April Overman filed this action against defendants City of East Baton Rouge (hereafter, "City") and Mayor Melvin "Kip" Holden (hereafter, "Mayor")[1] under Title VII of the Civil Rights Act of 1964 and the Louisiana Employment Discrimination Law ("LEDL"), which both prohibit discrimination in employment based on sex.  42 U.S.C. 2000e-2; LSA-R.S. 23:332.  Plaintiff claimed the defendants' decision to not hire her as Baton Rouge police chief in 2011 was because she is female.

For the reasons that follow, which shall constitute the court's findings of fact and conclusions of law issued pursuant to Rule 52(a)(1), Fed.R.Civ.P., judgment will be entered in favor of the plaintiff and against the defendants.

---

[1] Plaintiff sued the Mayor in his official capacity.  Record document number 1, Complaint, ¶ 4.  Plaintiff prayed for nominal, compensatory, punitive, exemplary and general damages; legal, equitable, injunctive and declaratory relief; and costs and attorney's fees.  *Id.*, ¶¶ 20, 21, 24, 25.

**Background**

During the first five months of 2011, the plaintiff tested,
applied and interviewed for the position of police chief for the
City of Baton Rouge.  The City advertised nationally to obtain
applicants for the position in an announcement issued January 19,
2011.  The position of police chief falls under the Louisiana state
civil service laws.  Therefore, the plaintiff and the other
applicants took the state civil service police chief examination.
Plaintiff scored a 96 on the test and was tied for the highest
score with another applicant.  Donald D. White, a male who was
later selected for the position, scored an 84, which was the 8th
highest score.[2]

After the civil service examination, a list of those who met
the minimum qualifications and took the examination was generated.
The Mayor appointed a committee consisting of 20-plus members (the
"large committee") who were local citizens, business leaders and
individuals holding positions in government.  The large committee
reviewed the applications of those on the qualified list and
selected 11 applicants to be interviewed by the large committee.
Both the plaintiff and White were selected for an interview.  The
large committee interviewed each applicant simultaneously, i.e. at
the same time. After these interviews, the members of the large
committee voted on the applicants to determine the top five.  This

---

[2] Defendants Exhibits 1 - 3.

2

group also included the plaintiff and White.[3]  The next step was interviews of the top five applicants by the Mayor and a committee of four individuals (the "small committee").[4]  Two members of the large committee who were also on the small committee were Walter Monsour, who at the time was President and Chief Executive Officer of the Baton Rouge Redevelopment Authority, and Reverend Raymond Jetson.[5]  The interviews with the Mayor and the small committee were scheduled on two different days.  White was interviewed on the first day and the plaintiff was interviewed on the second day, May 23, 2011.[6]  After these interviews the Mayor selected White as the new Baton Rouge police chief and made an announcement of his selection on May 27, 2011.[7]  Plaintiff was informed she was not hired for the position, and that the defendants had selected White.

After filing a charge of discrimination and receiving a right to sue notice from the Equal Employment Opportunity Commission, the plaintiff filed this action against the defendants under Title VII of the Civil Rights Act of 1964 and the Louisiana Employment Discrimination Law ("LEDL"), which both prohibit discrimination in

_____

[3] Defendants Exhibit 4 – 6.

[4] Record document number 59, Transcript Volume 1, p. 144 (hereafter, Volume 1).

[5] Record document number 60, Transcript Volume 2, p. 293 (hereafter, Volume 2).

[6] Volume 1, p. 116.

[7] Defendants Exhibit 13; Plaintiff Exhibit 13.

employment based on sex.  42 U.S.C. 2000e-2; LSA-R.S. 23:332.  In her Complaint the plaintiff claimed the defendants' decision not to hire her as police chief was because she is female.  Plaintiff essentially argued that her claim is supported by the fact that she is clearly better qualified than White, and that she was asked gender-based questions in the interviews before both committees and the Mayor.

The parties consented to try this case before a magistrate judge pursuant to 28 U.S.C. § 636(c) and waived a jury trial.[8] Both the plaintiff's and the defendants' motions for summary judgment were denied,[9] a bench trial was held,[10] after which the parties submitted post-trial memoranda.[11]  All of the stipulated facts, trial testimony, exhibits admitted at trial and memoranda have been considered.  The preponderance of the credible evidence establishes that in choosing the new Baton Rouge police chief the defendants intentionally discriminated against the plaintiff in violation of Title VII and the LEDL.  Defendants did not select the plaintiff as police chief because of her sex.

---

[8] Record document numbers 9, 10, 43 and 44.

[9] Record document number 32.

[10] Record document number 72, 73.

[11] Record document numbers 64, 68 and 71.

**Applicable Law**

**Intentional Discrimination under Title VII and the LEDL**

The well-established modified *McDonnell Douglas*[12] framework is applied to consideration of sex discrimination claims brought under federal and state law.[13]  Under this framework, a plaintiff must first create a presumption of intentional discrimination by establishing a prima facie case.  To establish a prima facie case of failure to hire based on gender, a plaintiff must show that: (1) she is a member of a protected group; (2) she applied for a position; (3) she was qualified for that position when she applied; (4) she was not selected for the position; and (5) after she was not hired the position either remained open or a male was selected to fill it.  *Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082, 1087 (5th Cir. 1994).  A plaintiff's prima facie case creates an inference of discrimination that shifts the burden of production to the defendant to articulate and come forward with evidence that the adverse employment action was taken for a legitimate, nondiscriminatory reason. *Reeves v. Sanderson Plumbing Prods.,*

---

[12] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817 (1973).

[13] The modified *McDonnell Douglas* approach is a result of the Supreme Court's decision in *Desert Palace v. Costa*, 539 U.S. 90, 123 S.Ct. 2148 (2003).  Under this approach a plaintiff relying on circumstantial evidence in support of her claim is not limited to demonstrating that the defendant's reason is pretextual, and may alternatively establish that discriminatory animus was a motivating factor in an adverse employment decision.  *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 341 (5th Cir. 2005).

*Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097; *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-56, 101 S.Ct. 1089 (1981). Once the employer articulates a legitimate, nondiscriminatory reason, the *McDonnell Douglas* scheme of presumptions and shifting burdens drops out of the picture and the trier of fact proceeds to consider all the evidence and decide the ultimate question: Did the plaintiff prove that the defendant intentionally discriminated against her because of her sex? *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Plaintiff can prove intentional discrimination by establishing either: (1) that the employer's proffered reason is not true but is instead a pretext for discrimination; or (2) that the employer's reason, while true, is not the only reason for its conduct, and another "motivating factor" is the plaintiff's gender. *Alvarado v. Texas Rangers,* 492 F.3d 605, 611-612 (5th Cir. 2007); *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir.2004).

If the plaintiff establishes that her gender was a motivating fact in the employer's adverse employment decision, the employer may establish an affirmative defense by proving that it would have made the same decision in the absence of the impermissible motivating factor of gender.  In other words, the employer must establish that its legitimate reason standing alone would have produced the same employment decision.  If the employer can prove this defense by a preponderance of the evidence, the plaintiff's

6

relief is limited to injunctive and declaratory relief, costs and attorney's fees. 42 U.S.C. §§ 2000e-2 and 2000e-5(g)(2)(B)(i); *Garcia v. City of Houston*, 201 F.3d 672, 676 (5th Cir. 2000).

Pointing to clearly superior qualifications is one way to demonstrate intentional discrimination.  But when a plaintiff is not relying on comparative qualifications alone to establish pretext, the plaintiff is not required to prove that she is clearly better qualified than the employee selected for the position. *See, Sanders v. Anadarko Petroleum Corp.,* 108 Fed.Appx. 139 (5th Cir. 2004); *Julian v. City of Houston, Tex.*, 314 F.3d 721, 728 (5th Cir. 2002); *E.E.O.C. v. Manville Sales Corp.*, 27 F.3d 1089, 1096 (5th Cir. 1994); *Johnson v. BAE Systems Land & Armaments, L.P.,* 2014 WL 1714487 *12 (N.D.Tex. April 30, 2014).

**Damages, Legal and Equitable Relief, and Mitigation**

The statutory provisions governing the relief the plaintiff is entitled recover upon proof of intentional discrimination under the Title VII and the LEDL are as follows.

Under 42 U.S.C. § 2000e-5(g), the enforcement provisions of Title VII, if the court finds that an employer has intentionally engaged in unlawful employment practice, the court may enjoin the employer from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement, with or without back pay, or any other equitable relief as the court deems appropriate.

7

Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the EEOC. Interim earnings or amounts that can be earned with reasonable diligence by the person discriminated against shall operate to reduce the back pay otherwise allowable.

Furthermore, under 42 U.S.C. § 1981a(a)(1), a plaintiff may recover against an employer who engaged in unlawful intentional discrimination prohibited under Title VII, compensatory and punitive damages as allowed in subsection (b) of this section, in addition to any relief authorized by § 2000e-5(g). Compensatory damages cannot include backpay, interest on backpay, or any other type of relief authorized under § 2000e-5(g). § 1981a(b)(2). A party is not allowed to recover punitive damages against an employer that is a government, government agency or political subdivision. § 1981a(b)(1). Finally, in an action under Title VII, the court in its discretion may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee, including expert fees, as part of the costs.

Similarly, under LSA-R.S. 23:303(A), of the LEDL a plaintiff who has a cause of action against an employer may file a civil suit in a district court seeking compensatory damages, back pay, benefits, reinstatement, or if appropriate, front pay, reasonable attorney fees, and court costs.

The purpose of these provisions for legal and equitable

relief, and damages, is to make the victim of discrimination whole. The function of back pay is to provide retrospective relief in order to restore the plaintiff to the position she would have been in absent the discrimination.  It covers the period to the date of judgment. The court has discretion to determine whether an award of back and front pay is an appropriate remedy for intentional discrimination.  However, in the absence of special circumstances, back pay should always be awarded when a violation of Title VII is found, and the instances where such an award is not allowed are exceedingly rare.  *Sellers v. Delgado Comty Coll.,* 839 F.2d 1132, 1136 (5th Cir. 1988); *Galindo v. City of Roma Police Dept.,* 265 F.3d 1059 (5th Cir. 2001)(*per curiam*).

Although the preferred equitable remedy is reinstatement, front pay is appropriate when reinstatement is not feasible. Determination of whether reinstatement is feasible is within the discretion of the court.   Courts have found reinstatement inappropriate in cases where a terminated employee has found other employment, has been replaced and reinstatement would have an unacceptable adverse effect on the replacement, where the parties have stipulated that reinstatement is not feasible or appropriate, and where there is antagonism between the terminated employee and the former employer.  Front pay will not be awarded unless the plaintiff shows that reinstatement is not feasible.  *Walther v. Lone Star Gas Co.*, 952 F.2d 119, 127 (5th Cir. 1992); *Hadley v. VAM*

*P T S,* 44 F.3d 1242, 376 (5th Cir. 1995); *Mota v. University of Texas Houston Health Science Center,* 261 F.3d 512, 526 (5th Cir. 2001); *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 121 S.Ct. 1946, 1950 (2001).

Front pay is a remedy for the post-judgment effects of discrimination. It is a form of equitable relief and is intended to compensate the plaintiff for lost future wages and benefits. This relief is remuneration for the plaintiff's lost income from the date of judgment to the date the plaintiff obtains the position he would have occupied but for the discrimination. *Floca v. Homcare Health Svs., Inc.,* 845 F.2d 108, 112 (5th Cir. 1988); *U.S. E.E.O.C. v. E.I. Du Pont De Nemours & Co.*, 406 F.Supp.2d 645, 663 (E.D. La. 2005).

A plaintiff claiming equitable relief in the form of back pay, reinstatement and front pay has a duty to mitigate her damages. *West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 393 (5th Cir. 2003), citing, *Sellers,* 839 F.2d at 1193; *Migis v. Pearle Vision, Inc.,* 135 F.3d 1041, 1045 (5th Cir. 1998). In *West* the court summarized the duty to mitigate damages as follows:

> He must use reasonable diligence to obtain substantially equivalent employment. Substantially equivalent employment is that employment which affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status as the position from which the [] claimant has been discriminatorily terminated. The burden is on the employer to prove failure to mitigate. Although the employer is normally required to prove that substantially equivalent work was available and that the former

10

employee did not exercise reasonable diligence to obtain
it, once the employer proves that an employee has not
make reasonable efforts to obtain work, the employer does
not also have to establish the availability of
substantially equivalent employment. A plaintiff may not
simply abandon his job search and continue to recover
back pay.

*Id*. (internal citations and quotations omitted).

A plaintiff's mitigation attempts need not be successful, but
must represent an honest effort to obtain substantially equivalent
work. *West,* 330 F.3d at 394. The reasonableness of plaintiff's
diligence is evaluated in light of the plaintiff's individual
characteristics and the job market. *Vaughn v. Sabine County*, 104
Fed.Appx. 980, 984 (5th Cir. 2004), *citing*, *Sellers v. Delgado
College*, 902 F.2d 1189, 1193 (5th Cir. 1990). The duty to mitigate
generally requires only that the plaintiff seek employment
substantially equivalent to the job that was discriminatorily
denied. The duty is not to accept a job substantially equivalent
to jobs previously held. *Floca*, 845 F.2d at 111-12.

Compensatory damages under § 1981a(b)(2) may be awarded to a
victim of intentional discrimination. However, compensatory
damages for emotional harm, including mental anguish, will not be
presumed simply because the plaintiff is a victim of
discrimination. The award of these damages must be supported by
specific evidence of the nature and extent of the harm. Such
evidence may include medical or psychological evidence. Emotional
harm or mental anguish may be manifested by sleeplessness, anxiety,

11

stress, depression, marital strain, humiliation, loss of self-esteem, excessive fatigue, ulcers or headaches. *DeCorte v. Jordan,* 497 F.3d 433, 442 (5th Cir. 2007); *Patterson v. P.H.P. Healthcare Corp.,* 90 F.3d 927, 938 (5th Cir. 1996).

### Analysis

#### Plaintiff proved a prima facie case of sex discrimination

The established facts contained in the Pretrial Order[14] and offered into evidence at trial proved the elements of a prima facie case of sex discrimination. Plaintiff is female, was qualified for the position, and the defendants selected a male applicant for the position.

#### Plaintiff proved her qualifications for the position were clearly superior to White's qualifications

The court finds by a preponderance of the credible evidence that, with regard to education, training and experience, the plaintiff's qualifications for the position were clearly superior to White's qualifications. This conclusion is supported by the uncontested facts found in the plaintiff and White's applications, and the testimony of the plaintiff, Terry Landry, and the Mayor.

Both the plaintiff and White possessed the minimum qualifications required by civil service to apply for the position

---

[14] Record document number 33.

of police chief.[15]  The Mayor testified that education was a factor
he considered in selecting the new police chief.[16]  The highest
educational level White attained was a high school diploma.
Plaintiff had earned a bachelor's degree in history, with magna cum
laude honors, a master of arts degree in sociology, a law degree,
and was enrolled in and close to completing of the requirements for
obtaining her doctoral degree in urban studies.  The Mayor
testified that a person could "get educated without getting all
those degrees."  Yet, he failed to explain how, without obtaining
a college or other advanced degree, White was "educated" beyond a
high school level, or obtained an education comparable to that
achieved by the plaintiff.  Based on the credible evidence, the
only reasonable finding is that the plaintiff's educational level
was clearly superior to White's.

The City published a job announcement for police chief on
January 19, 2011.[17]  The second paragraph of the announcement stated
as follows:

> The Police Chief is appointed by, and reports to, the
> Mayor-President.  The ideal candidate will possess police
> administration experience, with a strong leadership and
> management background, as well as collective bargaining,
> personnel and budgeting experience.   Ability to
> communicate effectively with the Major-President,
> government and civil leaders, and media is essential.

---

[15] Volume 1, pp. 151-52; Volume 2, p. 270.

[16] Plaintiff Exhibit 46, Mayor depo. p. 18.

[17] Defendant Exhibit 2.

Advanced specialty training, strong disciplinarian skills
and extensive community policing experience is desirable.

With regard to training during her law enforcement career, the
plaintiff attached to her application a little more than four pages
listing her law enforcement and legal training.  For example, the
list showed the plaintiff attained certification as an instructor
in National Drug Recognition, Intoxilyzer 5000, Drugged Driver
Detection and DWI Detection and Standardized Field Sobriety, and
was an expert in Traffic Fatality Reconstruction and National Drug
Recognition.[18]  As the plaintiff put it, she trained the trainers.
From 2000 through 2007 the plaintiff also attended courses and
seminars with the International Association of Chiefs of Police.
Plaintiff testified that she had extensive training in law
enforcement technology, employment issues, DNA and fingerprint
evidence, ethics and professionalism, incident command systems, and
emergency response.  Plaintiff attended seminars and courses on
supervision, search warrants and pen registers.[19]  She also attended
and presented at a variety of crime analysis seminars on different
techniques for analyzing crime trends and patterns using data and

_____

[18] Plaintiff Exhibit 18, Plaintiff's Application; Volume 1, p.
146.

[19] A pen register is an electronic device that decodes and
records all numbers called from a particular telephone line.
Installation and use of a pen register is subject to federal
statutes.  18 U.S.C. § 3121, et seq.

mapping.[20]

White was certified in field sobriety testing and operation of Intoxilyzer 5000, but was not an instructor like the plaintiff. White had some advanced and/or specialized training in accident investigation and other areas, but none of the training he listed indicated that he was an expert or a certified instructor. Of White's one page list of training, more than half of the approximately 2,100 hours listed were composed of the basic academy training he completed 20 years ago to become a Baton Rouge city police officer and later a Louisiana state trooper.[21] Plaintiff testified that she did not include basic training in her list because this type of training was required to become a law enforcement officer.

After considering the plaintiff's and White's lists and the description of training submitted with their applications, and the trial testimony of the plaintiff and Terry Landry,[22] the court finds by a preponderance of the credible evidence that the variety,

_____

[20] Volume 1, pp. 29-34.

[21] White's tenure with Baton Rouge city police began in July 1983 and ended in January 1990.  Plaintiff Exhibit 17, White's Application.

[22] Terry C. Landry is currently a Louisiana state representative.  Landry was employed for 27 years with the Louisiana State Police, and for four years was the Superintendent of the State Police.  Landry served on the large committee that interviewed and recommended the top five candidates to be interviewed by the Mayor and the small committee.  Volume 2, pp. 246-48, 259-61.

extent and relevance of the plaintiff's training was clearly superior to White's training.

At the time they applied for the position, both the plaintiff and White had many years of experience in law enforcement. Plaintiff began her career as a police officer for the city of New Orleans in February 1985; White began his career as a Baton Rouge city police officer in July 1983. However, White left the Baton Rouge city police in January 1990 to become a Louisiana state trooper. Except for his approximately six years with the Baton Rouge city police,[23] and his first two years with State Police, the other 20 years of White's career consisted of working in State Police units dealing with internal affairs and state-wide regulatory matters involving handguns, gaming and transportation/ environmental safety. White was promoted to his first supervisory position in November 1998 as a unit supervisor of weights and standards in the Transportation and Environmental Safety Section ("TESS") and continued serving in TESS, eventually being promoted to lieutenant, captain and major.

White's application and the testimony of Landry and the plaintiff show that White's experience with the State Police generally, and particularly in TESS, gave him experience in administration, management, personnel matters and budgeting. However, this evidence also demonstrated that the majority of

---

[23] Defendant Exhibit 15, White's application.

16

White's career and experience as a supervisor was unrelated to urban or community policing and law enforcement.  As Landry explained, community involvement is encouraged and generally is a component of the State Police, and the State Police has concurrent jurisdiction with every law enforcement agency in the state.  But the primary law enforcement function of the State Police is related to traffic; the State Police generally does not have community policing responsibility, especially in urban areas, and does not deal with urban crimes and crime problems.[24]  As a state trooper and supervisor White mainly dealt with statewide traffic, crisis management, and regulatory law enforcement matters related to gaming, handguns, and hazardous materials.[25]

In contrast, as a patrol officer, narcotics detective and supervisor the plaintiff remained in city policing, dealing with urban crime and crime problems for her entire law enforcement career.  Plaintiff was promoted to supervisory positions beginning in 1991 when she became a sergeant.  Plaintiff was promoted to lieutenant in 2004, and then captain in 2005, which was the rank

---

[24] Volume 1, pp. 20-27; Volume 2, pp. 265, 269, 276-77, 280-83.

[25] In the Mayor's press release and announcement of White's selection, the Mayor stated that "Major White currently" serves as Command Inspector of the Joint Emergency Services Training Complex for State Police, overseeing the Special Weapons and Tactics team, the Emergency Operations Center, training, and Capital and physical security.  Plaintiff Exhibit 13; Defendant Exhibit 13.  However, the Mayor testified that he did not have this information, and did not know if White held these positions, at the time he selected White.  Volume 1, pp. 238-40.

she held until her retirement in July 2010. In approximately 19 years as a supervisor, the plaintiff regularly conducted disciplinary investigations of officers, and investigated citizen complaints against officers from start to finish. Plaintiff was a commander and supervisor in divisions pertaining to narcotics intelligence analysis, DWI enforcement, crime analysis, traffic fatality investigation, information technology, records and criminal history, reserve division/crisis transportation, and central evidence and property.[26] Some of her supervision duties involved working with multi-million dollar budgets. At the time of her application, the plaintiff had 25 years of inner-city police enforcement experience. Except for the nine months the plaintiff was in research and planning doing entirely administrative work,[27] the plaintiff either worked in or supervised units dealing with urban crime and crime-related issues.[28]

---

[26] Volume 1, pp. 13-19, 23-24, 66, 80-82, 89-97, 135-41. Plaintiff at one time had a dual command, and as head of the reserve division, the plaintiff was out in the field supervising patrols. Plaintiff also played a prominent role in restoring the critical functions and infrastructure of law enforcement in New Orleans after Hurricane Katrina.

[27] Plaintiff had this assignment when she was recuperating from hand surgery. Volume 1, p. 15.

[28] Plaintiff testified to her work in city-wide community programs related to drugs, DWI enforcement, crime prevention, and mental health. Volume 1, pp. 14, 16, 89-91, 94-97. In addition to her full-time law enforcement career, from 2003 to 2011 the plaintiff was a part-time professor for the University of Phoenix, teaching undergraduate courses in criminal justice, sociology,
(continued...)

Plaintiff's application and her testimony regarding to her education, training and experience is uncontradicted and credible. Considering all the evidence relevant to the education, training and experience of White and the plaintiff, the court finds by a preponderance of the credible evidence that the plaintiff's qualifications for the position of police chief were clearly superior to White's qualifications.

**Plaintiff proved that the defendants' reasons for selecting White are not credible and were a pretext for discrimination**

Considering the testimony of the Mayor, the plaintiff, Landry and Monsour, the court finds by a preponderance of the credible evidence that the legitimate, nondiscriminatory reasons testified to by the Mayor are not credible.  The reasons given by the Mayor for selecting White are not believable because they are vague, subjective, contradictory, inconsistent and not supported by the credible evidence.  The court finds that they are a pretext for selecting White rather than the plaintiff because the plaintiff is female.

The Mayor directed that a national job search for candidates be conducted, essentially because he wanted to show the public that

---

[28](...continued)
political science, philosophy and business, and serving as lead faulty and area content chair for its school of Criminal Justice and Security.

everything was done to get the best person for the job.[29]  Yet, he contradicted this statement with his testimony that it was "imperative that we had the local experience because we had a gap to fill and the police department is very complicated and there are a lot of things that you have to know in order to make it function properly."  The Mayor believed that White had this local experience based on his prior service as a Baton Rouge city police officer. According to the Mayor, White could hit the ground running, already knew people and the Mayor did not have to take him around to meet people.[30]  Yet, the Mayor did not know when, or for how many years, White had worked as a city police officer in Baton Rouge.[31]  He did not recall White's rank, but testified it was not a lower position. However, the undisputed evidence shows that at the time White was appointed police chief, it had been more than 20 years since he had been a Baton Rouge city police officer.[32]   The Mayor had no information that after White became a state trooper in 1990, he somehow continued to obtain local experience, so that he knew the people and workings of the Baton Rouge city police department.[33]

---

[29] Volume 2, pp. 290, 306; Mayor depo., pp. 23-24.

[30] Volume 2, p. 296; Mayor depo., p. 27.

[31] Mayor depo., p. 9.

[32] White had been assigned to uniform patrol and then to traffic as a motorcycle officer.  *Id.*

[33] Volume 2, pp. 306-10.  The Mayor testified that the first
(continued...)

The Mayor failed to credibly explain how White's six and one-half years as Baton Rouge patrol and motorcycle officer more than 20 years earlier, fulfill his proffered "local experience" requirement.

The Mayor testified in his deposition that he looked at leadership ability and experience in his selection for police chief.[34]  Yet, the Mayor's subsequent trial testimony is inconsistent with and contradicted this statement.  The Mayor did not compare the supervisory experience or training of White and the plaintiff.[35]  The Mayor testified that he did not even look at the applications, but instead left that up to the Civil Service Commission.[36]  Before he interviewed the plaintiff, White and the other finalists, the Mayor also did not look at or consider any test scores, or any of the evaluations and votes of the large committee.

The Mayor emphasized that relationships and dealings with the police union were a very important consideration in his selection. He testified that this was due to a past history of problems between the police chief and the union.  But he did not question

---

[33](...continued)
time he met White was during the selection process.  Volume 2, p. 323.

[34] Mayor depo., p. 7.

[35] Volume 2, pp. 310-12; Mayor depo., pp. 17-19, 21-22.

[36] Volume 1, pp. 238-39.

White and the plaintiff about their experience with the police union or collective bargaining. In his deposition, the Mayor stated that he asked White about how he would deal with the union, and White responded he would do his best to talk to the union to work out any problems.[37] But there is no evidence that White had collective bargaining experience.[38] Considering all the evidence related to dealing with the police union, the court finds that the Mayor's statement that such experience was very important to him is not credible.

The Mayor stated that selecting someone who could best handle the challenges of a growing city facing crime issues was a factor, and that he wanted to know about any special programs the candidate intended to bring to the police force. Despite these assertions, the Mayor testified at trial that he never read the proposal the plaintiff provided to him and the committee after her interview. Plaintiff's "Proposal for Policing and Crime Reduction in the City of Baton Rouge" specifically addressed a factor the Mayor stated was relevant to his decision, but the Mayor did not even consider

---

[37] Mayor depo., p. 10

[38] *Id.*; Volume 1, pp. 86, 182-83; Volume 2, pp. 296-97, 317-18. Defendants asserted in their post-trial memorandum that White had experience with union matters. Defendants did not cite to any exhibit or trial testimony to support this assertion. Record document number 64, Defendants' Post-Trial Memorandum, p. 15.

it.[39]

The Mayor testified that one of the major things that had a
bearing on his decision and impressed him was White's explanation
during the small committee interview of why he did not go to
college.  White told the Mayor that he came from a poor family, and
he decided not to go to college.  Instead he went to work to help
his siblings go to college.  The Mayor stated that White's story
reminded him of himself and the things he had gone through in his
own life - being very poor and at a young age going to work to
survive and help his family members.  White's story also showed
that White put his family before himself.[40]  Based on the Mayor's
testimony that he identified with White's personal background as
being very similar to his own, White's personal background was an
important factor in the selection for police chief.

The Mayor interviewed the plaintiff several days after
interviewing White.  There is no evidence that the Mayor asked the
plaintiff a question to elicit information about her personal
background.[41]  The fact that the Mayor, who is male, identified with

_____

[39] Volume 1, pp. 106-08, 142-43; Volume 2, pp. 292, 312-14;
Mayor depo. p. 7.

[40] Mayor depo., pp. 7-8, 15-17, 41; Volume 2, pp. 297-98.  The
Mayor testified that he did not solicit this information.  White
provided the information after noting that he did not have a
college degree.

[41] If the Mayor had done so, he would have learned the
plaintiff had comparable personal life experiences.  Plaintiff came
(continued...)

23

the personal background of the male candidate he selected, and failed to question the female applicant - the plaintiff - to obtain any similar information about her personal background, demonstrates that the Mayor treated the plaintiff differently during the interview because of her sex.  The Mayor also testified that in making his selection it was very important to have someone "along the lines of a Jeff LeDuff," for the sake of continuity in the position.[42]  Thus, the Mayor's trial testimony regarding former police chief LeDuff - his belief that it was very important for his selection to have continuity with the former chief, who is male - further demonstrates that the Mayor's decision was motivated by gender.[43]

In the announcement of his selection, the Mayor stated that he had talked with many people about the finalists.  The Mayor noted that he talked to Col. Mike Edmonson and Landry about White.[44]  But there is no evidence that the Mayor talked to anyone about the

_____

[41](...continued)
from a single-parent family, worked at a young age to help take care of family expenses, and had to work and obtain scholarships to pay for college and law school.  Volume 1, pp. 109-114.

[42] Volume 2, pp. 292 and 295.

[43] The Mayor did not state in his deposition that selecting someone who would provide continuity with former police chief LeDuff was a very important factor.

[44] Plaintiff Exhibit 13; Defendant Exhibit 13; Mayor depo., pp. 11, 25, 28-29. Landry, however, testified that he never talked to the Mayor during the selection process.  Volume 2, pp. 277-78, 284.

plaintiff or anyone who had worked with the plaintiff.   In fact,
the Mayor testified that he did not check the plaintiff's
background or talk to anyone who knew or worked with the
plaintiff.[45]

However, the Mayor did testify in detail about hearsay
information he was told during the selection process, either by
individuals who were on the large committee and participated in the
interviews, or other individuals he could not identify.   He was
told the information during lunches, or just "walking and talking"
to people who participated in the interviews.   The Mayor stated
that the hearsay information he received about the plaintiff was:
(1) that the plaintiff had some problems in New Orleans; (2) that
the plaintiff had difficulty with another officer or several
officers; (3) that it was pretty much known from newspaper articles
and "the talk that there had been several run-ins that she's had in
the department," and, (4) there was talk going around the
department that the plaintiff "had problems with some of the
supervisors and some of the people because she was a woman."[46]
There is no evidence that the Mayor ever contacted or attempted to
contact any of the plaintiff's supervisors in New Orleans, or
otherwise made any attempt to find out whether there was any

---

[45] Mayor depo., pp. 11, 25-26, 28.

[46] Mayor depo., pp. 10-14, 20-21, 37-37; Volume 2, pp. 293-95.
Hereafter, all of this hearsay information will simply be referred
to as "the hearsay."

factual basis for the rumors.  The Mayor stated both in his
deposition and at trial that he specifically asked the plaintiff
questions during the interview, based on the things he had heard
about the plaintiff having problems in the New Orleans police
department.  The fact that the Mayor specifically questioned the
plaintiff about the hearsay demonstrates - and the court finds -
that his repeated statements he did not consider the hearsay and
that it had no effect on his decision are not credible.

Plaintiff's testimony about what occurred during the
interviews is credible.  The Mayor's testimony that he did not ask
gender-specific questions, did not address the plaintiff and say
"[w]hat about the men," or "let's talk about men," and did not ask
how she would deal with the men in the police department, is not
credible.[47]  There is no credible basis to believe the Mayor's
statements that gender was not a factor in his decision.[48]  The fact
that the Mayor asked the plaintiff questions about the hearsay,
asked her to talk about men and how she would deal with men in the

---

[47] Monsour first testified on direct examination that he did
not recall the Mayor asking the plaintiff a question about her
gender or being a woman.  Volume 1, p. 228.  He also testified
that he did not hear the Mayor ask her any questions  about her
gender.  *Id.* at 229-30.  Monsour's lack of recollection, or that he
did not hear the question, does not refute the plaintiff's
affirmative testimony on this point.  Monsour did not object to the
gender-based question asked by Jetson, and Monsour believed it was
a fair question. *Id.* at 229.

[48] Volume 1, pp. 48, 52-54, 117-19, 170-72, 176-80; Volume 2,
pp. 293, 295, 302-03, 315-16; Mayor depo., pp. 13-15, 35-37.

police department, and stated that he "felt, frankly, that would be a bad setting to have in a police department to begin with, if you've had adversarial relationships in another department," establish that he believed the unverified rumors that the plaintiff had problems with supervisors and others in the New Orleans police department because she was a woman. The court finds that plaintiff's gender was the reason he chose White and rejected the plaintiff for the position.

Not only did the Mayor believe the hearsay and ask gender-based questions in the plaintiff's small committee interview, he allowed and did not object when Jetson asked similar questions. The preponderance of the credible evidence establishes that Jetson, in both the large and small committee interviews, asked the plaintiff how a woman would be able to handle and command a predominately male police department.[49] Jetson asked these gender-based questions without objection from the committee chairmen or

---

[49] Volume 1, pp. 46-48, 52-54, 117-18, 176-77, 227-29; Volume 2, pp. 248-50, 316; Mayor depo., pp. 35-37. Plaintiff testified that the individual who asked this question in the small committee was the same person who asked the question in the large committee. Plaintiff did not know his name, but Monsour testified that the person who asked the question in the small committee was Jetson. This evidence supports the conclusion that Jetson was the committee member who asked the question in both interviews. Monsour testified that, to the extent of his recollection, Jetson's question was, "How do you feel it will be for a female to lead a predominantly male police force?" *Id.* at 229. There is no testimony that Jetson, or any other committee member or the Mayor, asked any male applicant how he would lead or feel about a police force that has female officers.

the Mayor.   Landry and Monsour both testified that they did not recall that any questions related to gender were asked in the large committee interviews, nor recall a committee member asking the plaintiff about how she would handle the men in the department. However, based on the credible testimony of the plaintiff and Monsour's testimony that in the small committee interviews Jetson asked the plaintiff about her ability to lead a male police force, the court finds that Landry and Monsour simply did not accurately recall the questioning during the large committee interview. Plaintiff's credible testimony establishes that in her large committee interview Jetson specifically inquired "how a woman would be able to command in a police department," which inquiry was a repetition of his subsequent inquiry in the small committee interview.

Similarly, the plaintiff's testimony establishes that in the small committee interview, after hearing the plaintiff's response to the Mayor's question about her ability to deal with men in the department, Jetson told the plaintiff that her response was the same as it was in the large committee interview and he was not satisfied with it.  Jetson told her he wanted a specific plan as to how she was going to deal with men in a police department.  Given the nature of Jetson's questions and those of the Mayor, it is clear that if the plaintiff was not female she would not have been asked these questions.  In other words, the plaintiff was subjected

28

to these questions because she is female.  The fact that Jetson not only asked but also pursued a more detailed answer to this type of question, without any objection or intervention from the chairmen or the Mayor, further supports and solidifies the finding that the Mayor's legitimate, nondiscriminatory reasons are not credible.

In summary, the plaintiff's testimony is by far the most credible and any conflicts in the evidence are resolved in favor of the plaintiff.  Considering all the uncontested facts, testimony and documents admitted at trial, and based on the applicable law and the analysis above, the court finds that the plaintiff has proven by a preponderance of the credible evidence that the reasons stated by the defendants for selecting White are not the true reasons, but are instead a pretext for discriminating against the plaintiff because of her sex.  A preponderance of the credible evidence establishes that in selecting White and not the plaintiff for police chief the true motive was intentional discrimination against the plaintiff because of her sex.

Given this finding, the affirmative defense - that the same decision would have been made absent the motivating factor of gender - fails as a matter of law.[50]  The defense can only be raised

_____

[50] Defendants argued that the evidence supporting the legitimate business reasons for selecting White is sufficient to satisfy the burden of demonstrating the same decision would have been made without consideration of the prohibited motive - gender. Given the finding that the defendants's legitimate, nondiscriminatory reasons are not credible, even if the defense did

(continued...)

if the plaintiff does not establish that the proffered legitimate, nondiscriminatory reason is a pretext, but proves only that the prohibited motive was a motivating factor in the employment decision.

### Damages, Legal and Equitable Relief, and Mitigation

Plaintiff alleged a claim for compensatory and punitive damages. However, by statute the plaintiff cannot recover punitive damages from the defendants. The City is a local government agency. Plaintiff did not present any evidence at trial to support a claim for compensatory damages. Thus, the plaintiff cannot recover either of these types of damages under 42 U.S.C. § 1981a.

The record contains evidence, primarily consisting of the plaintiff's testimony, related to the plaintiff's claims for legal and equitable relief in the form of of back pay, lost benefits, and mitigation. The significant relevant evidence is summarized below.

Plaintiff testified that if she would have been selected as police chief it would have resulted in an increase in her pension. Plaintiff stated that New Orleans and Baton Rouge are part of the same retirement system - Municipal Police Employees Retirement System (MPERS) - and her pension is based on the highest three

---

[50](...continued)
not fail as a matter of law, it would fail because the defendants have not proved it by a preponderance of the credible evidence.

years of salary in the system.  Based on the average of the highest three years, the employee then receives 3.33% (three and one-third percent) of that average salary for each year of service. Plaintiff testified the police chief position paid significantly more than she had been making as a police captain in New Orleans.

The job announcement stated that, depending on qualifications and experience, the starting annual salary for police chief would begin at $85,794 and go up to $118,758.[51]  According to the Mayor's testimony, White's salary when he was appointed was in the mid-range.[52]   The middle point of the published salary range is $102,276. Plaintiff testified that her pensions would have been based on the police chief salary she would have received. According to the plaintiff, the result is that her "pension would have come very close to doubling."[53]

Plaintiff testified that she retired from the New Orleans Police Department in July 2010.[54]   However, there were administrative delays, and she was not actually collecting a pension at the time she interviewed for police chief.  Plaintiff stated that because she was not yet receiving her pension she was

---

[51] Defendants Exhibit 2.

[52] Volume 2, p. 304.

[53] Volume 1, p. 68.

[54] Plaintiff's age at this time was 46, and at the time of trial was 51.  Plaintiff Exhibit 18.

still considered an active employee in the system. Plaintiff could not be retired and receiving a pension, and at the same time work and collect a salary as the Baton Rouge police chief. According to the plaintiff, if she would have gotten the job she could have stopped her application for retirement.

Plaintiff did not start receiving her pension income until November or December of 2011, at which time the plaintiff received $92,009.91. This amount covered the period from July 2010 to November/December 2011. Plaintiff's annual pension was $61,908.72.[55] At the time the plaintiff applied for police chief she was teaching part-time for the University of Phoenix and she continued to do so for another four months, until September of 2011.[56] In September 2011 the plaintiff took a job in Mississippi at a regional training academy as an instructor. Because of significant downsizing at the academy, the plaintiff later took on additional duties as training coordinator, deputy director, accreditation manager, grant administrator and interim director. Plaintiff testified that she could "see the handwriting on the wall" when the downsizing continued and the director's position was

---

[55] Plaintiff testified on direct examination her pension was $65,000 to $67,000, but on cross-examination agreed with the statement that her pension was $61,908.72. Volume 1, pp. 124, 206.

[56] Plaintiff stated she was paid per class for this part-time work and a small amount for supervisory duties. Plaintiff did not provide an amount for these duties, but stated she was paid about $2000 per class. Plaintiff did not state the number of classes she taught. Volume 1, pp. 204-05.

abolished.    She resigned her training academy position in September 2012 and dedicated herself full-time to completing her doctorate in urban studies, working on her farm, renovating her personal residence to sell it, and relocating her elderly mother to Mississippi.  From September 2012 until she completed the work for her doctorate in May 2014, the plaintiff was engaged in these activities and not seeking employment.  Plaintiff's salary at the Mississippi training academy started at about $40,000 in September 2011 and ended at about $50,000 in September 2012.[57]  This income was in addition to the plaintiff's pension.

After being rejected for the position of Baton Rouge police chief, the plaintiff applied for police chief positions in Ruston, Louisiana, and Gulfport, Mississippi, and sent out a few resumes, but generally she sought academic positions in the criminal justice area or government positions outside of police work.  Plaintiff started seeking employment again in 2014 after obtaining her doctorate, and in late 2014 obtained a job as a professor for Southern New Hampshire University, teaching courses in criminal justice and justice studies.[58]  Plaintiff was working in this position at the time of trial.[59]

---

[57] Plaintiff stated that her salary had increased to $55,000, but during the downsizing her salary was reduced to $50,000.

[58] Volume 1, pp. 12-13, 68, 124-25, 205-10, 217-19.

[59] Plaintiff did not provide any testimony about the nature and
(continued...)

33

Defendants argued that based on the evidence the plaintiff is entitled to little, if any, legal and equitable relief. Defendants pointed out that in 2010 the plaintiff's income was almost as much as if she had gotten the police chief job, because at the end of 2011 she received $91,000 in pension income. Defendants also argued that plaintiff is not entitled to lost wages during the period from September 2012 when she resigned her training position in Mississippi, until late 2014 when she obtained her doctorate, because she voluntarily withdrew from the workforce and failed to make reasonable efforts to seek comparable employment.

Defendants' arguments on back pay and mitigation are persuasive, in part. Plaintiff's testimony regarding her employment, salary, and efforts to obtain employment and complete her higher education after she was denied the police chief job, is uncontradicted and credible. Based on a preponderance of the credible evidence, the court finds that the plaintiff proved that she is entitled to back pay until December 31, 2014, but not thereafter. From May 27, 2011 until December 31, 2014, the evidence supports finding that the plaintiff made a sufficient, reasonable effort to mitigate her damages and find substantially equivalent work in areas of her expertise and qualifications. Plaintiff (1) completed the retirement process and obtain her

_____

[59](...continued)
extent of her teaching and other duties at Southern New Hampshire. Nor did the plaintiff provide any information about her salary.

pension, which provided her with an annual income of approximately $62,000,[60] (2) continued teaching part-time with the University of Phoenix and at the same time looked for a another full-time academic position in the field of criminal justice, (3) obtained and held the instructor position at the Mississippi regional training academy until it was clear she would be let go or her salary significantly reduced, (4) left the training academy and devoted all of her time to finishing her doctorate, renovating her home to sell and relocating her mother, and (5) obtained her doctorate, and resumed searching for academic employment in areas for which she was qualified by her education and experience, such as criminal justice.

Defendants' argument that from September 2012 until late 2014, the plaintiff failed to make a reasonable, diligent effort to mitigate her damages, is unpersuasive. The reasonableness of plaintiff's mitigation efforts must be evaluated in light of the plaintiff's individual characteristics. Given the plaintiff's age when she applied for police chief, her 25-plus years experience in law enforcement, her law degree and completion of all but her dissertation for her doctorate, it was reasonable for the plaintiff to complete the retirement process, get her pension, and look for full time academic work in the legal/criminal justice field.

---

[60] This is based on rounding up the $61,908.76 stated by the plaintiff on cross-examination.

35

Plaintiff succeeded in her efforts by obtaining the job at the Mississippi regional training academy.  Plaintiff's decision to pursue this course, resulted in her having an annual income of about $10,000 more than the salary she would have earned as Baton Rouge police chief.[61]  Given the situation the plaintiff faced in September 2012, her decision to leave the Mississippi job, finish her doctorate, relocate her mother, and renovate her home was also reasonable.  Based on events at the Mississippi training academy, the plaintiff reasonably believed either she would be laid off or her salary significantly reduced.  At the same time, the plaintiff needed to relocate her mother and sell her personal home.  By leaving the Mississippi job the plaintiff could both take care of her personal responsibilities and finish her doctorate.  After obtaining her doctorate the plaintiff could apply for higher-salaried positions at colleges, universities, and other institutions.  The evidence shows that this is in fact what the plaintiff did.  Plaintiff received her doctorate in May 2014 and then began looking for employment in higher education.

Although the plaintiff obtained a position as a professor with Southern New Hampshire University in late 2014, she presented no evidence as to her job duties and responsibilities, whether the job

---

[61] A pension of $62,000 added to the $50,000 salary would total $112,000.  Had she been selected, the plaintiff would have been paid a mid-range police chief salary of $102,300.

is full-time or part-time, or what salary she is being paid.[62] Without such evidence, the court cannot conclude that accepting this position constitutes sufficient effort to find substantially equivalent work and mitigate her damages. Therefore, the court finds the plaintiff can recover back pay from May 27, 2011 until December 31, 2014, but is not entitled to recover any back pay from January 1, 2015 until the date of judgment.

Plaintiff also claimed that she suffered a loss of pension benefits as a result of being denied the job of Baton Rouge police chief. Defendants argued that the plaintiff had actually retired before applying for the Baton Rouge job, and would not have received the pension during any period she would have worked for Baton Rouge. Therefore, her pension could not have been recalculated.

Defendants's arguments are confusing and not supported by the evidence. Plaintiff's testimony as to effects on the calculation of her pension is uncontradicted and credible. A preponderance of the credible evidence establishes that if the plaintiff had been selected, she would have served as police chief for at least three years - until May 31, 2014. With these three years of service at the significantly higher salary of police chief rather than police captain, the amount of the plaintiff's yearly pension would have

---

[62] There is no evidence as to the exact date the plaintiff began working for Southern New Hampshire University.

37

almost doubled.  Therefore, the court finds that the plaintiff's
yearly pension would have increased by $60,000.  Plaintiff did not
argue or present evidence in support of a specific amount or number
of years she should recover for the loss of the increase in her
pension.  It would strain equity to award the plaintiff an amount
for this loss that will last indefinitely.  Considering all the
relevant evidence, the court finds that an award to compensate the
plaintiff for the loss of three years of increased pension income
is equitable.

Neither side presented any arguments or evidence related to
the issues of reinstatement and front pay.  The court finds that
placing the plaintiff in the position she was discriminatorily
denied is not feasible.  Putting the plaintiff in the position of
Baton Rouge police chief now would displace the current police
chief, who has been serving in this position since White's
termination.  Moreover, the plaintiff is retired and receiving a
pension.  Plaintiff testified that after she began receiving a
pension, she could not return to police work in a department within
the same retirement system.[63]

Plaintiff did not argue that she was entitled to an award of
front pay, and the court finds that such an award, in lieu of
placement in the position, is also not supported by the evidence.
Plaintiff's current age is 51.  Plaintiff has 25-plus years

---

[63] Volume 1, pp. 216–19.

38

experience in law enforcement, a law degree and a doctorate in urban studies. Given the plaintiff's work history and educational accomplishments, it is reasonable to find that she will continue to receive her pension and, for the foreseeable future, will also engage in full-time employment at an educational institution. Her salary when combined with her pension will likely be equivalent to what she would have earned as Baton Rouge police chief. Therefore, the court finds that the plaintiff is not entitled to the equitable remedy of front pay.

The foregoing findings result in the following calculation of back pay and lost pension increase.

Calculation of back pay:[64]

```
Back pay:
6/1/2011 to  12/31/2011  @ $102,276 /yr. = $  59,661
1/1/2012 to  12/31/2014  @ $102,276 /yr. = $ 306,828
                                  TOTAL  $ 366,489
Credits against back pay:
    Pension
6/1/2011 to  12/31/2011  @ $ 5,159 / mo. = $  36,114[65]
    Pension
```

---

[64] All numbers are rounded to whole dollar amounts unless otherwise indicated.

[65] This amount is the plaintiff's monthly pension benefit for the remaining seven months of 2011 after she was denied the police chief position. Plaintiff's annual pension is $61,909, or $5,159 monthly. The calculation is: $61,909 / 12 x 7 = $36,114.

```
1/1/2012 to  12/31/2014                    $ 185,727
   Salary - Mississippi training academy
1 year                                     $  50,000
   Salary - University of Phoenix
4 months (estimated)                       $   2,500
                               TOTAL   $ 274,341
                        NET BACK PAY   $  92,148

   Calculation of loss of pension increase:

Estimated expected, annually        $ 121,909[66]
Actual, annually                    $  61,909
Estimated loss, annually            $  60,000
Period of loss: three years
                        TOTAL       $ 180,000
NET BACK PAY + TOTAL LOST PENSION INCREASE
           = TOTAL MONETARY RECOVERY  $ 272,148
```

<u>**Conclusion**</u>

Based on the foregoing findings of fact and conclusions of law, judgment will be entered in favor of plaintiff April Overman and against defendants City of East Baton Rouge and Mayor Melvin "Kip" Holden, in his official capacity, in the amount of $272,148, plus interest.  A separate judgment will be entered.  Any motion

---

[66] The estimated pension amount is based on the plaintiff's testimony that her pension would come very close to doubling. Volume 1, p. 68.  Consequently, the estimated amount lost, $60,000 annually, is less than half of double the plaintiff's actual annual pension of $61,909.

40

for an award of attorney's fees and non-taxable costs shall be made as provided by Rule 54(d)(2), Fed.R.Civ.P.

    Baton Rouge, Louisiana, September 22, 2015.

 

STEPHEN C. RIEDLINGER
UNITED STATES MAGISTRATE JUDGE